[RULING RE: PETITIONS FOR TERMINATION OF PARENTAL RIGHTS] CT Page 4343
The mother of the children is Elizabeth V., date of birth February 8, 1973. Anthony N. was born in Hartford on December 24, 1986; the father of the child is shown as Jose N., of Hartford.[2] Miguel R. was born in Hartford on July 20, 1988; the father of the child is Miguel R., Sr., an incarcerated person, date of birth September 6, 1956.[3]
Anthony N. and Miguel R. were committed to the Department of Children and Youth Services (DCYS), now the Department of Children and Families (DCF), as uncared for/homeless children on September 14, 1989.[4] Petitions to terminate parental rights were filed June 20, 1991, and amended September 8, 1992.[5] With respect to respondent/mother, both petitions allege termination grounds under General Statutes Section 17a-112b(1) [(Abandonment,)] (2) [Failure to Rehabilitate,]) and (4) [(No Ongoing Parent/Child Relationship)]. As to each of the named fathers, the petitions allege termination grounds under Section 17a-112b(1) ([Abandonment]) and (4) [(No OngoingParent/Child Relationship.)]
On the Miguel R. petition, the court, on November 4, 1991, granted the motion of counsel for the child's paternal aunt to intervene; said aunt, Ramona M., was granted intervenor status for dispositional purposes only.[6] Both children have resided, continuously, in the V. foster home since on or about December 12, 1989. Also on November 4, 1991, the court granted, without objection, the motion of the foster parents, Angel and Julia V., to intervene for disposition only; upon a review of the financial documentation submitted, an attorney was appointed to represent the interests of the intervening foster parents.
[NOTICE AND JURISDICTION]
The affidavit of the process server, dated June 28, 1991, states that after a diligent search, in hand service could [not] be effected on Elizabeth V. and Jose N.; further, that the said parents were not residing at their last known Hartford address(es). On July 1, 1991, the court entered an order of notice by publication in the Hartford Courant; the affidavit filed by the newspaper (with clipped legal advertisement annexed), dated July 8, 1991, confirmed notice by publication. CT Page 4344
With regard to Miguel R., Sr. (father of Miguel R.), the record discloses that he was personally served, in court, on July 16, 1991. On that date, the court, on the record, confirmed service on the respondent/parents; the docket entry reads: "Service Confirmed, mother and father [Jose N.] by publication; father Miguel R., Sr., in hand . . . 7/16/91." Jose N. has not appeared, and his whereabouts have remained unknown;[7] Elizabeth V. and Miguel R., Sr., appeared through counsel and have fully litigated the termination petition(s).
The court finds that notice and service have been effectuated in accordance with the requirements of law, and that this court has jurisdiction to adjudicate the pending termination petitions.
[STANDARD OF PROOF]
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its right and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child or the religious affiliation of the child." General Statutes § 45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. [Anonymous v. Norton,] 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." [Stanley v. Illinois,]405 U.S. 645, 651 (1972); [In Re Juvenile Appeal (Anonymous),]177 Conn. 648, 671 (1979). The integrity of the family unit is protected by the Ninth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. [Stanley v. Illinois,] supra. "The right to family integrity includes `the most essential and basic aspect of familial privacy — the right of the family to remain together without the coercive interference of the awesome power of the state.'" [Duchesne v. Sugarman,] 556 F.2d 817,824 (2d. Cir 1977); [In Re Juvenile appeal (83-CD),]189 Conn. 276 1983). Both the child and the parent(s) have a constitutionally protected interest in the integrity of the family. [Santosky v. Kramer,] 455 U.S. 75 (1982). And, the CT Page 4345 "rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions." [See: In Re Juvenile Appeal,] 187 Conn. 431, 435
(1982).
The constitutional guarantee of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing" evidence, not merely a fair preponderance. [Santosky v.Kramer,] supra. Thus, the standard of proof as mandated by Conn. General Statutes Section 17a-112(b) and Prac. Bk. Section 1049 is "clear and convincing" evidence. [See:] e.g. [InRe Juvenile Appeal (84-3),] 1 Conn. App. 463 (1984).
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended (substantively). [In Re Juvenile Appeal (84-AB),]192 Conn. 254, 262 (1984); [In Re Nicolina T.,] 9 Conn. App. 598,602 (1987); [In Re Luke G.,] 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, may inquiry be made regarding the ultimate best interests of the child. However, since Section 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, one ground only need be established for the granting of the petition. [In Re Juvenile Appeal (84-BC),] 194 Conn. 252, 258
(1984); [In Re Nicolina T.,] supra.
[FACTUAL FINDINGS]
The credible evidence presented during the course of the trial established the following facts.
A. [Factual Occurrences Preceding the Filing of the Termination Petitions.]
Respondent/mother, twenty-one years of age, was born the youngest of four children to Marie V.; she has a sixth grade education, having dropped out of school at age thirteen, and she neither reads nor writes. The mother admits having been addicted to drugs in her early teens. Anthony N. was born when respondent/mother was thirteen years old (approaching her fourteenth birthday); Miguel R. was born approximately CT Page 4346 eighteen months thereafter, when Elizabeth V. was fifteen. Respondent/mother has two younger children: Angel V. (three years of age at time of trial), and Veronica O. (one and one-half years old at time of trial); the father of the younger children is Angel O., date of birth March 10, 1970, with whom Elizabeth V. has lived continuously for approximately four and one-half years.
In late 1988, respondent/mother, along with her children, Anthony N. and Miguel R., resided with the maternal grandmother, Marie V., at the latter's apartment; thereafter, around July 1989, respondent and the maternal grandmother were evicted from and took up residence in the home of a maternal aunt, Marisol V. In mid-December 1988, DCYS received a referral from a social worker associated with DMR's EDIT program stating that the children, Anthony N. (age two) and Miguel R. (age nine months), were often dirty, unchanged, and inappropriately dressed for winter; it was also reported that several of the children's medical appointments had been missed, and that on a home visit there was observed conduct indicative of drug involvement. In January 1989, another referral was received again reporting indicia of drug dependency, and also, that the children were unattended to by the mother, that they were hungry, and that the maternal grandmother did not assist in the children's care. In early February 1989, the Department was informed that DMR's EDIT program had closed its file because of respondent/mother's lack of participation.[8]
On or about April 5, 1989, both children were brought to the pediatric clinic at St. Francis Hospital and were admitted to the hospital for observation. The hospitalization was precipitated by a report received by DCYS, from the VNA, that a nurse's examination of the younger child, Miguel R., revealed possible sexual abuse.[9] Additionally, Anthony N. was observed by the VNA representative to be "extremely passive" and non-responsive; it was the nurse's conclusion, supported by observations detailed in her affidavit, that "both children were at risk for abuse secondary to the chaotic home environment in which numerous persons were observed entering and exiting the apartment without the mother's immediate knowledge."[10] On or around April 7, 1989, respondent/mother, reportedly, admitted to the DCYS social worker that she was addicted to heroin and consumed at least three bags of the narcotic per day; at that time, Elizabeth V. acknowledged that CT Page 4347 she could not provide an appropriate home for the children and agreed to their voluntary placement. The children were discharged from St. Francis on April 12, 1989, directly into foster placement.[11]
On July 28, 1989, the Department filed neglect petitions; it was alleged that each child was permitted to live under conditions, circumstances, or associations injurious to his well-being, and that each was denied proper care and attention physically, emotionally, and morally. [cf.] General Statutes Section 46b-120. As stated, on September 14, 1989, both children were adjudicated uncared for/homeless.[12] At that time, the following expectations were established by the court: (1) maintain contact, and cooperate, with DCYS; (2) visit as often as permitted by the agency; (3) participate in drug/alcohol counselling; (4) procure adequate housing; and (5) no substance abuse. The CIP written expectations form was signed by respondent/mother on 9/14/89, and by her attorney;[13] the form included the following written advisement:
 "If you fulfill the court's expectations, you will improve your chances of regaining, or keeping, guardianship of your [children] permanently. Failure to achieve these goals will increase the chance that . . . petition[s] may be filed to terminate your parental rights permanently so that your [children] may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCYS worker."[14]
Between April 12, 1989, the date the children were placed under the VP, and September 14, 1989, the date of commitment, visitation by respondent/mother was exceedingly limited; according to documentation, the mother visited only once following foster care placement on 4/12/89. As stated, Anthony N. and Miguel R. remained in the Ro. foster home until mid-December 1989. Around the time of the commitment, it was again emphasized and explained to respondent/mother that visitation with the children should occur no less than once every week. It was stressed that the children were very young, thus requiring frequent and consistent contact with their natural parent(s), and that increased frequency of visitation was imperative in order to maintain any parental relationship; according to the testimony of the social worker, CT Page 4348 respondent/mother seemed to understand.[15] Apparently Elizabeth V. did visit with an improved degree of frequency in the weeks immediately following the commitment; a treatment plan filed by the Department, dated November 12, 1989, reports: "[m]other visits children at least twice per month."[16] As of November 12, 1989, it was reported that respondent/mother was residing with a friend; DCYS was also informed that she had no permanent home, claimed not to be using drugs, was refusing drug treatment, and was ten weeks pregnant. The foster mother, Mrs. V., testified that respondent/mother visited on just one or two occasions during the calendar year 1990; in such regard, the Department social worker stated that the visitation was "sporadic". A May 1990 TP filed by DCYS showed the most recent visit by respondent at that time as having occurred in late February 1990. The social worker, Ms. Ruiz-Sabater, testified that she addressed the issue of visitation with Elizabeth V. on each occasion "she could reach her"; according to the worker, the mother's response was that she had "no time" for visitation, was looking for an apartment, could not get to the foster home, and did not have sufficient money.[17] Visitation by the mother remained virtually non-existent into, and thru, the year 1991, according to both the foster mother and the Department social worker;[18] there appear to be three recorded visits in 1991.[19]
Although notices were sent to whatever address DCYS had for respondent/mother, she did not regularly attend TP reviews.[20] With respect to the counselling expectation, respondent/mother neither accepted nor pursued drug therapy referrals made, and/or recommended, by the agency worker; the mother, early on, informed the agency that she was attending a program (Project Mash) available in the subsidized housing complex where she resided with the maternal grandmother and/or other family members.[21] Although respondent/mother did not remain in the Project Mash program, she maintains that she has not used drugs since 1989/90 and, significantly, neither of her two younger children, Angel V. and Veronica O., was born drug addicted (these two younger children have always resided with Elizabeth V., although there was some suggestion in the evidence that their paternal grandmother participated, at times, in their day-to-day care).[22] The credible testimony certainly indicated that the mother's level of cooperation and contact with DCYS was, at best, exceedingly marginal. There were periods in 1990 and 1991 when Elizabeth V.'s whereabouts were unknown to the agency. In addition to the drug therapy CT Page 4349 referrals, DCYS offered to refer respondent/mother for parenting skills counseling; after Ms. Ruiz-Sabiter explained the importance of counselling in terms of working towards reunification, the mother at first expressed interest, but never re-contacted the social worker regarding initial arrangements and scheduling. The worker testified, credibly, that correspondence was always forwarded to respondent/mother's last known address.
Respondent/mother never presented any specific or viable plan to the agency regarding Anthony N. and Miguel R. However, she did indicate that her objective was reunification; Elizabeth V. told the foster parent that she wanted the children with her "because she loved them."[23]
Respondent/mother was generally welcome in the foster parents' home and there is no evidence that the foster parents [ever] prevented or hindered visitation; on occasion, the foster mother actually assisted in transportation for purposes of visitation. Respondent/mother was free to telephone the V. home, and apparently did so. Although the mother did not send cards or letters, she did, when visiting on a birthday, bring presents. Elizabeth V. did not inquire of the agency (or the foster parent) regarding the medical care, or early educational needs, of the children. The social worker testified that when respondent/mother telephoned the Department, it usually was not to inquire of Anthony N. and Miguel R., but rather to seek assistance with reference to the acquisition of suitable housing.[24] In 1990, after visiting the children for the first time in three months, Elizabeth V. telephoned Ms. Ruiz-Sabater inquiring as to why the oldest child, Anthony N., no longer called her "mommy."
Prior to the filing of the TPR (6/20/91), respondent/mother last visited Anthony N. and Miguel R. in February 1990, according to DCYS and the foster mother, Mrs. V. Petitioner maintains that the mother contacted the foster home on 12/31/90, 2/3/91, 3/3/91, and 4/1/91 to arrange visitation, but did not appear on the scheduled dates. Respondent/mother disputes the contentions advanced by DCYS; she produced written records, prepared with the assistance of Angel O., the man with whom she has cohabitated for the past four years (the father of Angel V. and Veronica O.), which reflect numerous visitations during 1990/91, each of approximately one hour in duration. Elizabeth V. testified that she began "keeping tract" in July 1991, that she recorded CT Page 4350 all visits and telephone calls with the help of Angel O., and that when she could not "make a visit", she would always call the foster mother, often speaking with the children.[25] At the time of the filing of the instant petitions, the Department reported that respondent/mother resided in Hartford with the maternal grandmother, Maria V.
Jose N., the father of Anthony N. has never contacted either DCYS or the foster parent(s) regarding his son and, as stated, his whereabouts have remained unknown; he did not participate in these proceedings. The evidence indicated that Jose N. has had no contact whatsoever with Anthony N. since on or before the child's placement (4/12/89). Respondent/mother testified that Jose N. is the father of Anthony N., that Jose N. has never contributed to the support of the child, that the father has never visited Anthony, and that he has not helped her (Ms. V.) in any way with the care and maintenance of said child.
Miguel R., Sr. was incarcerated at the birth of Miguel R. During his criminal trial, his sister, Ramona M., spoke with Elizabeth V., learned of the birth of the baby, and was informed by the mother that the child had been voluntarily placed with DCYS. Both Miguel R., Sr. and respondent/mother testified that Mr. R. (the father) assisted financially in Elizabeth V.'s prenatal care and in making preparations for the child (money for the purchase of clothing and other necessary items for the baby). As stated heretofore, Miguel R., Sr. signed documents acknowledging paternity in 1988; however, he had no contact with the child during the initial three years of Miguel R.'s life, and sent no birthday cards or gifts. Upon being informed that Miguel R. was no longer with respondent/mother, the father requested that Ramona M. ascertain the child's status with a view towards having Miguel R. placed with, and cared for by, his paternal aunt. As early as February 1990, Ramona M. contacted DCYS expressing an interest in the child and requesting consideration as a placement resource.[26] As of the date the termination petitions were filed, Miguel R., Sr. had been convicted of murder and was serving (and continues to serve) a sixty year sentence for murder.[27] According to the social worker, the Department held two administrative reviews on Miguel R's treatment plans at the correctional facility where the father was an inmate. The social worker stated the first TP review was at the correctional institution where Miguel R., Sr. was CT Page 4351 confined on May 30, 1990; the worker indicated that she met the father for the first time on that date, that she provided him with her card and office telephone number, and that she informed him of his right to periodically visit with his son at the facility. The father was told visitation could be arranged, in accordance with the usual procedure, thru contacting his counselor at the institution and requesting visitation. The social worker was never contacted by either Miguel R., Sr., or by his prison counselor. The father first saw Miguel R. at a TP review, at Somers, on June 10, 1991;[28]
at that time, the child and the maternal aunt accompanied the social worker to the prison for the purpose of conducting the review. The child was brought to Somers to visit with his father, not at the request of the father (or the aunt), but by arrangement of the social worker acting on her own. At this point in time, Miguel R. was almost three years of age; there is indication in the record that introduction of the young child to his father, and the overall visitation session, went reasonably well.[29] The social worker testified that subsequent to June 10, 1991, Miguel R., Sr. never requested visitation with his son.[30] The father's plan for the child is placement (transfer of guardianship, etc.) with the paternal aunt.[31]
As stated heretofore, the termination petitions were filed June 20, 1991;[32] the social worker testified that the decision to file was based on a number of considerations, including: no indication of any significant rehabilitation on the part of respondent/mother; her failure to comply with expectations and the consequential absence of any parent/child relationship; the length of time the children had been in foster placement; the fact that the commitments had already been extended; the circumstances of Miguel R., Sr., with respect to his serving a life sentence, and his perceived disinterest in initiating and/or maintaining visitation; the dearth of family resources on the maternal side;[33] the absence of any interest whatsoever by Jose N. (or any member of his family); and, the limited visitation requested, and exercised, by the paternal aunt, Ramona M.[34]
B. [Factual Occurrences Subsequent To the Filing of Termination Petitions.]
Following the filing of the termination petitions, psychological evaluations were ordered of respondent/mother, CT Page 4352 Miguel R., Sr., the children, the paternal aunt, and the foster parents, with full parent/child observations. As stated, both the paternal aunt and the foster parents were granted party status in this proceeding for dispositional purposes only. As also stated, at the time of filing, the mother's whereabouts could not be ascertained, and notice was effected, constructively, through publication.[35]
The testimony indicated that respondent/mother visited much more frequently after the filing of these petitions. The credible evidence showed Elizabeth V. visiting her sons at the V. foster home on approximately fourteen occasions during calendar year 1992. The foster parent testified that the visits were approximately one hour in duration, and on certain dates, Elizabeth V. would be accompanied by the maternal grandmother and/or a maternal aunt. When respondent/mother visited, the foster mother would call the children, both boys would come and kiss their mother, and she would spend the time visiting with them in a perfectly appropriate manner. At times, the children acted somewhat "confused," and neither asked for their mother or father. Respondent/mother would often call when she was unable to visit, although there were times during this period when she did not do so, according to the foster parent. There was no particularly noticeable reaction on the part of Anthony N. and Miguel R., when the mother did not appear; they did not seem depressed or disappointed, and, to Mrs. V., it seemed that both boys merely looked upon their natural mother as "just another person or visitor." As counsel for the children has argued, even the increased visitation during the months following the TPR filing was not weekly as contemplated, it averaged just a little more than once per month, and the mother made no request for overnight or weekend visitation.[36] On certain occasions, the foster parent provided the mother with transportation back to her home. Although respondent/mother visited with the children, she did not generally inquire of their medical or educational well-being. Elizabeth V. maintains that during calendar year 1993 she has visited regularly with her sons; she has offered her handwritten record to confirm her more recent, increased visitation.[37]
Respondent/mother acknowledged that she missed treatment plan reviews for the children in late 1991, and in 1992 and 1993; she maintains, however, that she did not receive notice of the TP's. Elizabeth V. was cross-examined at length CT Page 4353 concerning the number of residences she has had over the past three or so years, and the fact that it did not appear she had lived in any one place for longer than six months. The evidence disclosed that respondent/mother had resided at approximately nine different addresses over a period of roughly three years; she stated she did not feel the frequent moves had had any detrimental effect on her two younger children, and explained that the frequent moving was precipitated by her desire to find more appropriate housing for the family.[38] There is no indication that respondent/mother entered, and/or successfully completed, any drug treatment program(s) following the filing of these petitions; Elizabeth V. stated that she neither uses, nor is addicted to, drugs. There have been periods of time when the Department has been unable to ascertain the mother's whereabouts, and DCYS views her as generally uncooperative. As of trial, respondent/mother had lived at her current address, with her two children and Angel O., for approximately three months. With regard to Elizabeth V.'s asserted long-term abstinence from narcotics, Angel O. admitted on cross-examination that he had made telephone referrals to DCYS stating that the mother was on drugs and was not taking proper care of the two younger children, Angel V. and Veronica O.; Mr. O. stated that the content of the referrals had been untrue, and that he fabricated that information for the reason that he was "angry" with respondent/mother.[39]
Elizabeth V. resides at her present apartment with Angel O. and their two children, Angel V., age three, and Veronica O., age one and one-half.[40] Respondent/mother testified that she and Angel O. have been living together, continuously, for approximately four and one-half years. Their current apartment has two bedrooms, one of which is occupied by the two children. Angel O. is twenty-three years of age and, at the present time, is employed by United Cerebral Palsy; he testified that he has been so employed for approximately eight months as a ADT programmer, working with elderly and disabled persons, caring for them, and taking them on trips. According to Mr. O., he has held this position since around February 1993, was unemployed prior thereto for about one year, and, at a previous time, worked as a security guard (or private investigator).[41] He currently works a forty hour week earning $9.13 per hour. Respondent/mother testified she receives public assistance of $631 per month, with a food stamp supplement of $200 per month; the current rent is around CT Page 4354 $500 per month (including most of the utilities),[42] leaving Elizabeth V. roughly $131 in cash plus the $200 in food stamps to run the household. Additionally, Mr. O. contributes towards the support and maintenance of the family.[43]
Respondent/mother believes that with Angel O. employed, and with the additional assistance she would receive, she can adequately provide for the two children who are the subjects of the instant petitions when and if they are returned to her care. She testified that she was told by both DCYS and the court to procure a suitable apartment and to "get straight"; she indicates she has done both, that she loves these two boys very much, and now "I want them back, I did what they told me to do." The mother claims that her relationship with the father of her two younger children is long term and stable, although she admits there have been times when disputes have arisen and he (Angel O.) has returned to his mother's home.[44]
Miguel R., Sr. saw his son, Miguel R., twice since June 10, 1991; both meetings were at the evaluations conducted by Dr. Suarez in November 1991 and November 1992. He testified he had expected a visitation with his son at the TP review held at Somers on December 8, 1992; although DCYS personnel were present, the child, Miguel R., was not brought to the correctional facility for visitation.[45] The social worker testified that the father never requested visitation (either through his counselor, or through direct communication with the Department); the father admitted he had not phoned the worker to request visitation. According to Mr. R., he sent letters, sweaters, and other gifts to both Miguel R. and Anthony N., apparently through his sister, Ramona M. As stated, Miguel R., Sr. considers, and offers, the paternal aunt, Ramona M., as a principle resource for the care and upbringing of his son, Miguel R.
C. [Psychological Evaluations.]
Pursuant to the court order of 11/4/91, Dr. Miguel Suarez, Ph.D., conducted psychological evaluations of the children and all other parties (excluding Jose N., whose whereabouts were unknown), with full parent/child assessments. The initial evaluations were conducted on November 25 and 26, 1991. Dr. Suarez testified that he is a licensed psychologist with a specialty in child custody matters; he has practiced in Connecticut for a number of years. The court is familiar with this psychologist's outstanding education and professional CT Page 4355 credentials; he has previously testified before this court as an expert in the field of psychology in other custody cases. Dr. Suarez is licensed in Puerto Rico, Rhode Island, and in this jurisdiction. He has previously conducted numerous court ordered evaluations in termination of parental rights cases; he estimates that he does roughly one-hundred evaluations per year, and has been previously qualified as an expert in the various trial courts of this state. Dr. Suarez is multi-lingual, and is fluent in both English and Spanish. Dr. Suarez was qualified in this case as an expert in the field of general psychology, with specialized expertise relating to child custody matters.
At the time of the evaluation, Anthony N. was four years old and attended kindergarten in a full-time, regular classroom. During the course of the evaluation, the child's attention and concentration were within normal limits; the child had no current medical problems and the evaluation did not reveal "any significant psychopathology." However, the psychologist observed that Anthony N. might have been experiencing some anxiety related to the "instability of his current placement."
Miguel R. was three years of age when Dr. Suarez first saw him and the child had not yet started school. The child had not experienced any significant medical problems and, from a psychological standpoint, his actions, attention, and concentration appeared entirely age appropriate. Although it was reported that Miguel R. tended to be "aggressive with peers at times," Dr. Suarez observed no significant signs of behavioral problems.
Respondent/mother was nineteen at the time of these evaluations, was unemployed, and had a very limited educational background;[46] although Elizabeth V. was described as "generally cooperative" during the evaluation, the psychologist reported evidence of speech articulation problems. The mother's mood was described as "anxious", and she indicated she had experienced recent episodes of depression. However, the psychologist found Elizabeth V.'s thought processes to be logical and coherent, her attention and concentration within normal limits, she was entirely oriented, and her memory functions appeared intact. In Dr. Suarez's estimate, respondent/mother's sphere of intellectual ability was (and is) within the "below average range of CT Page 4356 intelligence."[47] Psychological testing of the mother suggested "marked impairment of psychological functions and severe psychological problems." The psychologist reported that testing results indicated, with respect to the mother, these characteristics: "impaired ability to abstract, impaired ability to synthesize, poor adaptability, poor affective control, anxiety, decrease in motivation, depression, oppositionalism, passive-aggressiveness, and psychological blocking. In a report filed January 3, 1992, Dr. Suarez stated:
 "This test suggested that Ms. V. employed fantasy as a means of avoiding reality since reality is perceived as less than satisfactory and desirable . . . she . . seems to be experiencing feelings of personal inferiority. The major mood experienced by Ms. V. is depression. Anxiety level is relatively extreme . . . and there is a propensity towards impulsivity. The experience of impulsiveness adds certain negative expectations as to Ms. V.'s capacity for independence. She tends to maintain a relatively reserved accessibility in interpersonal contexts and tends to withdraw, rather than face, anxiety-producing social situations. Rebellious behavior may be a descriptive component to Ms. V.'s overall interpersonal style. An acting out potential is present."
At the time of this evaluation, respondent/mother was expecting a child and reported that she was receiving prenatal medical care at CHS; no particularized health problems were evident. Dr. Suarez went on to report, as follows:
 "[Ms. V.] indicated that she uses alcohol occasionally, however, she tends to have a binge-drinking pattern that indicates the possibility of alcohol abuse. She denied any current use of drugs, however she reported that in the past she used heroin on a daily basis for about six months."
The psychologist noted that there was no history of any violent acts by the mother and found "no evidence of aggressive demeanors." Based on his evaluation, Dr. Suarez concluded:
". . . [Ms. V.] is an adolescent who has severe CT Page 4357 learning problems as well as emotional problems. She became a mother at an early age without being prepared emotionally or developmentally to be a mother. At present, she seems to be experiencing symptoms of anxiety and depression that appear to be reactive to her present situation. She also has a history of alcohol and drug abuse for which she has not received any treatment. This may likely recur in the future under stressful situations, especially since she has not received any treatment for such.[48]
The psychologist stated his "diagnostic impression" regarding respondent/mother as "Neurotic Depression" and "Polysubstance Abuse (alcohol and heroin — in remission)", and highly recommended that Elizabeth V. become involved in "a drug and alcohol rehabilitation program as well as . . ongoing counseling to help her deal with longstanding psychological problems."
In the course of the 1991 evaluation, Miguel R., Sr. was cooperative, alert, with an estimated intellectual ability in the average range. He consistently protested his innocence with respect to the murder charge and conviction. He informed the psychologist that he was single, thirty-four years of age, had a ninth grade education, was never legally married, and has three natural offspring (including Miguel R.), none of whom resided with him.[49] Dr. Suarez indicated that the testing suggested marked impairment of psychological functioning and severe psychological problems, including anxiety, tension, and hostility. Miguel R., Sr. indicated that if his son could not be permanently placed with the paternal aunt (Ramona M.), he would prefer that the child be adopted by the V. foster parents.
According to Dr. Suarez, the paternal aunt, Ramona M., was forty-three years of age, unemployed, had a fourth grade education, and could not read or write except for signing her name. She had previously been employed in restaurants and factories as a semi-skilled worker, has been married for twenty-five years, has three grown children (one of whom lived with her at the time of the evaluation), and resides with her husband who is employed as a truck driver; her husband's income is used to support and maintain the marital family. Dr. Suarez found Ms. M.'s thought processes to be logical and CT Page 4358 coherent, her memory functions were intact, she was entirely oriented, and her attention and concentration appeared to be within normal limits; Ms. M. was entirely cooperative during the evaluation. The psychologist, however, detected symptoms of anxiety, and the testing suggested psychological problems; there existed no history of alcohol or drug abuse, and no record of any psychiatric problems. There were indications of medical problems, but not of such magnitude as would restrict, or interfere with, parenting capacity. Dr. Suarez estimated the paternal aunt's intellectual ability to be within the below average to average range. There was no history of violent acts. In his 1991 evaluation, Dr. Suarez concluded:
 "Given the results of this evaluation, it appears that Ms. M. has significant learning problems that appear to be secondary to an organic brain dysfunction. It is my impression that she had problems in school and probably felt very inadequate. It is also my impression that she has developed secondary emotional problems as well, characterized by feelings of inadequacy and probably low self-esteem."
At the time of evaluation, the foster mother, Mrs. V., was forty-two years old, married for twenty-two years, reported having a ninth grade education, and was not employed outside of the home. She was cooperative in the conducting of the evaluation, her thought processes appeared logical and coherent, attention and concentration were within normal limits; Mrs. V. was entirely oriented, memory functions were intact, certain anxiety symptoms and depression were detected, and her intellectual ability was estimated to be "between the average to below average range." Dr. Suarez found no significant psychopathology, and no past history of psychiatric or substance abuse problems. Mrs. V. informed the evaluator that she suffered from episodes of depression. The psychologist noted that she seemed preoccupied regarding the future of these children. It was also noted that Mrs. V. was under medical care and taking medication for high blood pressure. Dr. Suarez concluded that the foster mother was attached to Anthony N. and Miguel R., and was experiencing anxiety and depression apparently related to the uncertainty of the children's future placement and their possible removal from the foster home.
The foster father, Angel V., was forty-five years of age CT Page 4359 at the time of the initial evaluation, has an associates degree in accounting, and is employed. During the evaluation he was cooperative, logical, and coherent; there were no observed indicators of distress, depression, anxiety, or of recurring family problems (alcohol/drug abuse, etc.). The psychologist found no evidence of any significant psychopathology, the foster parent was not undergoing any form of medical treatment, and there existed no significant medical or psychological problems. Dr. Suarez concluded that there was no psychopathology which would impede him from parenting these two boys.
The parent/child assessments were conducted by Dr. Suarez through participation by each of the parties in informal play sessions with the children, a procedure in conformity with the accepted practice for children of these ages. With respect to respondent/mother, the psychologist (in 1991) observed that her communication with both boys was "extremely poor", and she was unable to structure any type of game with the children, thereby allowing [them] to play independently. Anthony N. called Ms. V. "Mommy" at one point, and then referred to her as "Elizabeth", indicating the child's sense of confusion; according to the psychologist, no signs of affection were observed between the boys and their mother. Dr. Suarez stated that the children appeared distant and distracted during the assessment; he concluded:
 "It was my impression that these children [were] confused at best in relationship to who Ms. V. [was] to them. It was also my impression that there has not been a parental bond established between the children and the mother due to lack of continuous contact with the children."
At observations conducted on November 25, 1991, Miguel R., Sr., informed Dr. Suarez that he had seen his son on only one prior occasion when the child was brought to Somers Correctional Center. The psychologist described the father/son session, as follows:
 ". . . Mr. R. looked happy, however, he was somewhat detached from the child. The child sat on his lap and stayed calm most of the time. Mr. R. showed some affection to the child, to which the child did not respond in an appropriate fashion." CT Page 4360
Concerning Miguel R., Sr., Dr. Suarez concluded: "[i]t was my impression that there is no paternal bond that has been established because of lack of continuous contact between the father and the son."
During the observation of Ramona M. with Miguel R., the paternal aunt was openly affectionate with the child, to which the child responded appropriately; the child called the aunt by her first name and appeared perfectly relaxed in her company. Dr. Suarez's assessment was, as follows:
 "Their relationship was cordial and showed a degree of appropriate affection. However, given the fact that Mrs. M. [had] not had any continuous contact with [Miguel R.], it [was] my impression that there [had] been no bond established between [Miguel R.] and his aunt . . . it [was] my impression that there is the potential for this bond to be established given enough time."
During the parent/child observation involving the foster mother, Mrs. V. allowed the children to play freely and she was effective in maintaining the level of interest of the children in the play sessions; communication was "fairly good," and both children referred to Mrs. V. as "mother." It was Dr. Suarez's impression that "the children and the foster mother have a very good relationship and that Mrs. V. is the psychological mother of both Anthony N. and Miguel R."
With regard to the P/C involving the foster father, it was observed that the children called Mr. V. "father," communication was "fairly good," and the children appeared to enjoy his company. Dr. Suarez concluded: "[i]t was my impression, given the observations made during the . . evaluation, that father-child bonds have been established between [the children] and Mr. V."
Dr. Suarez stated that the results of the evaluation confirmed that neither biological parent could properly parent the children [at that time.] He felt that respondent/mother had intellectual as well as emotional problems which "may" hinder her ability to act as the principal caretaker for Anthony N. and Miguel R. Because of insufficient contact, the psychologist believed there had been "no parental bond" CT Page 4361 established between the boys and their biological parents. Similarly, he concluded, in 1991, that "no bond" had been established between the paternal aunt and Miguel R. He further concluded that Mr. and Mrs. V. were the children's psychological parents, and that "it would be psychologically detrimental for the children to be separated from each other as well as from the foster parents." The psychologist recommended that "parental rights be terminated in order for these children to be appropriately adopted and given a permanent home."
On September 24, 1992, updated evaluations with p/c were ordered by the court. These evaluations were conducted by Dr. Suarez on November 6[,] 1992; the psychologist's report, filed 11/18/92, indicates that respondent/mother never appeared for the evaluation(s).
With regard to Miguel R., Sr., the evaluator observed "no obvious demonstration of affection" between father and son (Miguel R.), and it was reported that they had seen one another on only two prior occasions; and at the 11/6/92 evaluation, the child did not recognize his father. Miguel R., Sr., again stated that if custody could not be effected with the paternal aunt, he would prefer that Miguel R. remain in the present foster placement; the psychologist noted that the father showed concern about his son's future. However, "no interaction" was observed between Miguel R., Sr., and Miguel R., and Dr. Suarez stated that in his opinion, there never had been a father/son bond established, due to the extremely limited contact.
In November 1992, Miguel R. was observed happily interacting with his paternal aunt, and vice-versa; the aunt informed the evaluator that she had been visiting her nephew three days per week. The child called his aunt "Ramona," she played with him "appropriately," encouraged Miguel R. to do things correctly, and their relationship was described as "a cordial one." Nonetheless, the psychologist concluded, in 1992, that there did "not appear to be a parental bond established between the child and his aunt."
During the 1992 play sessions, both children called the foster mother, Mrs. V., "momi" (mother), and it was observed that she maintained "very good communication" with them. Mrs. V. played appropriately with the children at their level, CT Page 4362 properly structured their conduct, and provided stimulation and reinforcement; both children appeared "extremely happy" with their foster mother, and Dr. Suarez concluded that a strong parental bond had been established, and further, that Mrs. V continued to be the psychological mother of both Anthony N. and Miguel R.
The children called their foster father, Mr. V., "papi" (father), and they appeared very happy in his presence. He engaged the children in play in a proper manner, and provided appropriate structure, stimulation, and reinforcement. During this November 1992 evaluation, Miguel R. appeared more expressive and had noticeably improved his language skills in both English and Spanish; Anthony N. also appeared more verbal, although somewhat more shy than his brother. The psychologist found a strong parental bond between the children and their foster father, and concluded that Mr. V. was their psychological father.
Dr. Suarez's November 1992 conclusion was, as follows: "It would be in the best interests of [Anthony N. and Miguel R.] to remain in their foster placement, as it would be psychologically detrimental for both children to be removed from their psychological parents who have provided love and good care for both of these children."
In early 1993, the court, over petitioner's objection, ordered an updated evaluation (with p/c) of respondent/mother; Dr. Suarez conducted the update on March 29, 1993 (report filed 4/28/93). During the play session, both children initially appeared "shy and withdrawn;" however, the mother tried to "engage the children in play in an appropriate fashion and the children warmed up and started to play with the difficult toys." The psychologist felt that the mother's verbal comparison of the children in terms of one knowing the alphabet was entirely inappropriate, resulting in one child becoming more withdrawn. The evaluator observed that Elizabeth V. appeared to provide more attention to Miguel R. than to Anthony N., and neither child appeared to respond "appropriately" to the mother's expressions of affection. The March 1993 conclusion of Dr. Suarez was, as follows:
 "It is my impression that Ms. V. did try to do her best . . . in terms of interaction with the children. However, it is also my impression that CT Page 4363 she lacks knowledge about child rearing practice and appropriate age behavior in children. It was also my impression that there is no parental bonding between Miguel and his mother. However, it is also my impression that there is some bonding between Anthony and Ms. V. However, this does not appear to be very strong."
Dr. Suarez testified that in conducting his evaluation, he spent a total of some nine hours with the participants and believed that this was more than sufficient time in which to formulate his conclusions and recommendations. He was emphatic in his testimony that a strong emotional bond existed between the brothers, that they should not be separated, that to do so could be psychologically harmful, and that their best interest, in his judgment, would be served by their remaining together.[50] Similarly, the psychologist was emphatic that the removal of the children from the foster home, given the very strong bonds which had developed, would be psychologically detrimental.
In his testimony, Dr. Suarez described "bonding" as the special relationship and emotional attachment between parent and child which forms the basis for the stability, security, and wellbeing of the child and the particular parent/child unit (family). He explained "psychological parent" as the person who nurtures and creates the self-image of the child; the person(s) recognized by the children or child as mother and father. The evaluator found no signs of bonding, or of any parental relationship, between Miguel R. and his biological father. He testified that there was absolutely no reason to believe that the paternal aunt, Ramona M., could not adequately parent Miguel R.; however, the psychologist seriously questioned whether any "parental" bond could develop with the aunt, even over a substantial duration, such as would replace, or displace, the existing strong bond with the foster family.[51] Dr. Suarez expressed the view that he found Ramona M.'s interest to be primarily in her nephew, although he conceded that he neither conducted, nor was asked to conduct, any assessment of her relationship, if any, with Anthony N.
Dr. Suarez, initially, found no evidence of any parental bonding between respondent/mother and the two children; as indicated, there had been exceedingly limited contact. He testified, consistent with his report, that in 1991, he CT Page 4364 observed few, if any, signs of affection between Elizabeth V. and her children. In 1993, given the more frequent contact between mother and children in the interim, an increased demonstration of affection, as well as more effective, structured play activity, was observable. Dr. Suarez testified he found respondent/mother's interaction with the children "more positive" in 1993 than it was in 1991. And, as stated, evidence of the development of a bond with one child was observed in 1993, but the psychologist felt it was not a particularly strong mother/child bond. Regarding any change between 1991 and 1993, the evaluator testified he considered the mother's behavior with the two children "more effective, more positive," in 1993.
Dr. Suarez testified that the mother's capacity to parent the children was quite questionable, and clearly was not achievable within any reasonable time, absent substance abuse counseling and professional assistance addressing existing psychological problems; the psychologist stated that such would involve long-term therapy and, in his view, these two children should not have to wait, thereby deferring any real hope for stability, certainty, and permanency in their family lives. Dr. Suarez testified that in March 1993, the relationship he observed between mother and children was [not] a "healthy" one. He testified that the degree of change he observed, as to respondent/mother's interaction with the children, occurring between the 1991 and 1993 evaluations, did not, at all, alter his conclusion that termination of parental rights would serve the best interests of Anthony N. and Miguel R.[52] In late Fall 1993, Dr. Suarez testified, without equivocation, that his recommendation in this case continued to be "termination of [the] parents' rights and adoption by the foster parents."
D. [Other Disposition Evidence: Intervening Parties.]
(1) [Paternal Aunt of Miguel R.: Ramona M.]
Documentation in the court file indicates that counsel was appointed to represent Ramona M. on July 22, 1991, a little more than a month subsequent to the filing of these petitions.[53] Thereafter a CSC was conducted (on or about August 16, 1991); at or around that time, there was an indication that the aunt would visit her nephew as often as three times per week.[54] The aunt testified that visitation CT Page 4365 with Miguel R., at the foster home, on a frequent and regular basis, commenced around November 1991.[55] She has continued, commendably, to visit with her nephew about three times a week since late 1991. The evidence indicated that Ms. M.'s visits are usually about one hour in length; when the child is otherwise involved, the aunt will often converse with Mrs. V. at length. Ramona M. admitted that she spends little time with Anthony N. during the course of this visitation.
Ms. M. stated that when she was informed by the DCF worker that the two brothers could not be separated, she offered to assume the caretaking responsibilities for both Anthony N. and her nephew, Miguel R.[56] She testified that she remains willing to have and raise both boys. When asked if she loved both children, she responded: "Well, yes." And, when she was questioned about her motivation in offering a home for Anthony N., she replied, at one point: "If he is given to me, I'll take him." She acknowledged that she had no photos of herself and Anthony N., that her visitation with Anthony N. was extremely limited, and that she did not send (or bring) cards or presents to Anthony N. on his birthdays.[57]
Ramona M. resides with her husband and her seven year old foster child in a two bedroom apartment. It would appear from the evidence that the paternal aunt can provide a perfectly adequate home not just for Miguel R., but for both boys, if they were placed in her care. The evidence disclosed that Ramona M.'s home was certified by CFS as a suitable foster placement resource for one child as early as January 1, 1991;[58] the foster child who is in her home pursuant to that certification is a specialized needs child. A CFS representative testified that Ramona M. has provided good care for the special care foster child and has been completely cooperative with service providers.
Ramona M. testified that she has never had a particularly close relationship with Elizabeth V., but that "they get along now." The paternal aunt stated that she was concerned with her nephew being taken from the V. home, where he has received such good care, and with which family he has so strongly bonded; but nevertheless, she felt Miguel R. should definitely be with his family. Ramona M. visits her nephew three times a week and on major holidays; she has given the child gifts frequently. She testified that she does not speak to Miguel CT Page 4366 R. regarding his father, but admitted that initially she was considering taking the child, and caring for him, just until Miguel R., Sr.'s difficulties with the criminal law were resolved, and he was released. Ms. M. is a lovely lady, her home and marital life are stable, and the inescapable conclusion is that she genuinely loves her nephew, Miguel R.
(2) [Foster Parents: Julia and Angel V.]
The foster parents have been married for twenty-two years; they have two natural children, ages nineteen and sixteen, and two adopted children, ages twelve and ten.[59]
Anthony N. and Miguel R. call the V.'s "momi" and "papi;" the children initially referred to their foster parents as "Julia" and "Angel", but upon hearing the older children call them "momi" and "papi," they proceeded to do the same. Mrs. V. stated that early on she told the boys not to call her "momi" since they had an actual mother; however, because Anthony N. and Miguel R. insisted on calling her "momi," she did not object further as time went on. When these children were first placed in the foster home, the V.'s did not intend to adopt; however, early in the placement they developed a willingness to adopt if that became possible through a termination of the biological parents' rights; apparently, this was sometime in 1990.
Mr. V. is employed as a printer; Mrs. V. is a housewife. Anthony N. and Miguel R. are in good health and attend grammar school. The foster mother has taken both boys to all medical appointments and has done all their school planning and registration. The evidence indicated, unquestionably, that Julia and Angel V. are outstanding foster parents, are very much devoted to, and love, Anthony N. and Miguel R., and have provided them with an excellent, loving, and nurturing home. The children have thrived in this placement; the foster parents continue to express their willingness to adopt.
[ADJUDICATION]
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged ground has been established by [clearand convincing evidence.] As stated previously, the "clear and convincing" burden of proof is constitutionally mandated. CT Page 4367 [Santosky v. Kramer,] supra. This evidentiary requirement necessitates a standard of proof that is between the standard required in an ordinary civil action and that required to find guilt; there must be "more than average certainty on the part of the fact finder." [In Re Juvenile Appeal (84-3),] 189 Conn. 276,297 (1983); [Dacey v. Connecticut Bar Assn.,] 170 Conn. 520,536-37 (1976); [In Re Juvenile Appeal,] 1 Conn. App. 463,467-68 (1984).
As stated, these termination petitions were filed June 20, 1991. The court's adjudicatory consideration is limited to those events [preceding] the filing date.[60] [In re RomanceM.,] 30 Conn. App. 839, 859 (1993). Circumstances [subsequent] to the filing date maybe considered [only] with reference to an appropriate disposition, consistent with the best interests of the child, [following] an adjudication. [Id.] It has been observed that under existing Connecticut law, "the determination of the child's best interests comes into play only [after] [a] statutory [ground] for termination of parental rights [has] been established by clear and convincing evidence." (Emphasis in original). [In re Valerie D.,]223 Conn. 492, 511 (1992); [In re Jessica M.,] 217 Conn. 459,465-66 (1991); [In re Kelly S.,] 29 Conn. App. 600, 617-18 (1992), [also: In re Romance M.,] supra at p. 859. The burden is on the petitioner (DCF) to prove, by the mandated standard, a statutory ground for termination; our Supreme Court has stated:
 "As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination . . . We have observed . . that `[i]nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interest of the child' . . . A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship . . . Similarly, questions concerning the ultimate custodial placement of the child may not be intermingled with the issues of termination . . . `[there still must be a two step process to determine whether cause for termination] . . . [has been proved' before the availability of a proper adoptive home can be considered] . . . The availability of such a placement CT Page 4368 is not, in itself, a ground for the termination of parental rights. `[[A] parent cannot be displaced because someone else could do a better job of raising the child] . . .'" (Emphasis added).
[In re Jessica M.,] supra at 465-467.
Additionally, the Connecticut Supreme Court, in discussing the necessity of establishing a statutory ground for termination (by clear and convincing evidence) before reaching any "best interests" considerations, has emphasized the distinction between a termination action and ordinary custody proceedings:
 "In contract to custody proceedings, in which the best interests of the child are always the paramount consideration, and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. [No all-encompassing best interests standard vitiates the requirement of compliance with the statutory criteria."] (Emphasis added).
[In re Luis C.,] 210 Conn. 157, 165 (1989).
Thus, in the instant case, petitioner is required to prove, by clear and convincing evidence, the existence of a statutory ground for termination, as of the date of filing.
A. [Abandonment.]
General Statutes Section 17a-112(b)(1) provides: "The superior court upon notice and hearing may grant . . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . ."
Statutory abandonment focuses on the parent's conduct; it is a question of fact to be resolved by the trial court in the CT Page 4369 light of the relevant circumstances. The test for factually determining statutory abandonment is not limited to simply whether the parent has shown some [minimal] interest in the child. [In Re Juvenile Appeal (Docket No. 9489),] 183 Conn. 11,14-15 (1981); [In Re Rayna M.,] 13 Conn. App. 23, 36 (1987); [InRe Adoption of Webb,] 14 Wash. 651, 657 (1975). Statutory abandonment differs from the concept of abandonment in the common-law sense in that it does not require proof of an intention to abandon totally or permanently. [In Re ShannonS.,] 41 Conn. Sup. 45, 151 (1989). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." [In ReMigdalia M.,] 6 Conn. App. 194, 208-09 (1986). In the [In ReMigdalia M.] decision, the Appellate court stated that statutory abandonment occurs where "a parent fails to visit a child, fails to display love and affection for the child, has no personal interaction with the child, and no concern for the child's welfare." Id. at p. 209.
Section 17a-112(b)(1) refers to a parent's failure to maintain "a reasonable degree of interest, concern or responsibility" regarding the child's welfare. Thus, the statute does not contemplate a sporadic showing of the indicia of" interest, concern or responsibility for the welfare of the child," but rather, the term "maintain implies a continuing, reasonable degree of concern." [In Re Rayna M.,] supra; [In ReMigdalia M.,] supra. The standard respecting statutory abandonment is "not whether the parents have shown [someinterest] in their children," but rather, "[c]ommon sense dictates that a parent's obligations toward . . . [a] child go further than a minimal interest." (Emphasis in original). [InRe Rayne M.,] supra. Furthermore, it is noted that "interest" alone is not the criterion for the determination of statutory abandonment; the statute refers to interest, [concern] or [responsibility] regarding the child's welfare.
(1) [Respondent/Father: Jose N.]
Jose N. has had no contact with Anthony N. during the course of the child's placement. His whereabouts have remained unknown, he has never contacted the Department or the foster parent(s) regarding Anthony N., he has had no contact or communication with the child during the years of placement, and he has not participated at all in these proceedings. He CT Page 4370 has not contributed to the support of Anthony N. during the child's placement. Regarding the putative father, Jose N., petitioner has met its clear and convincing evidence burden of establishing the termination ground of statutory abandonment.
The court hereby finds, applying a clear and convincing evidence standard of proof, that petitioner has established [statutory abandonment] as a ground for the termination of the parental rights of Jose N. to the child Anthony N.; that is, that Anthony N. has been abandoned by Jose N. in that the putative father has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the said child. The court further finds, by clear and convincing evidence, that the said ground of [statutory] abandonment has existed over an extended period of time which is not less than one year.
(2) [Respondent/Mother: Elizabeth V.]
Petitioner contends that respondent/mother did not maintain any [reasonable] degree of interest in, or concern for, her two sons during the period of some twenty-one months between the date of commitment (9/14/89) and the date of filing (6/20/91).[61] In the court's view, the [credible] evidence supports this contention, clearly and convincingly.
At the time of the commitment, Elizabeth V. was 16 years, seven months of age; on the date of filing, the mother was eighteen years, four months of age. Indisputably, she was extremely young and quite limited intellectually; in the evaluating psychologist's language, she, tragically, was not prepared "emotionally or developmentally" for motherhood. Notwithstanding such unfortunate reality, the evidence clearly revealed that respondent/mother was explicitly advised at the time of commitment, and on a number of occasions thereafter, of what was expected of her, minimally, in terms of an eventual reunification and, most specifically, of the importance of maintaining regular and frequent contact with these children, who were of such young ages. The court accepts as perfectly credible the testimony of Julia V. that respondent/mother's visitation was extraordinarily sporadic and negligible for the period of around eighteen months preceding the filing date (perhaps two visits in 1990, and three in [late] 1991); it seems apparent that the late 1991 visitation (post-filing), and the increased 1992 visitation, CT Page 4371 resulted from, or were spurred by, the Department's action in filing for TPR. The court also accepts as credible the testimony of the social worker that she repeatedly advised Elizabeth V. (when the mother could be located) of the critical need to see the two young boys often and regularly in order that a parental relationship could develop and be maintained. The mother's failure to visit, and the loss of any relationship with the children as a consequence thereof, was a principal consideration precipitating the filing by DCF of these petitions. Even considering the mother's age and limitations, her having visited Anthony N. and Miguel R. only four or five times during the many months preceding the filing was neither [reasonable] nor justifiable. The children were both in the same foster home continuously during that protracted period, it was located in the [same] city as, and not particularly distant from, respondent/mother's residence(s), and easy and direct bus transportation was available. Elizabeth V. was welcome in the foster home, DCF would facilitate visitation and reimburse fares for public transportation, and the mother was neither working nor in school.
Respondent/mother's protestations to the social worker that she was "too busy" and did not have the money or the time to visit would not constitute, under the circumstances, a [reasonable] basis for failing to maintain [regular] contact with her placed children. While it is true that during much of the subject time period, Elizabeth V. was a very young mother with a newborn child (Angel V., d/o/b 6/27/90), no plausible reason was advanced why such circumstance would retard her ability to visit her sons, at least a few time a month at a foster home located in the same city where the mother made her residence. At [As] to financial ability, Ms. V. was receiving state assistance (upon the birth of the third child) and, as stated, the agency would defray costs of transportation. Similarly, it is difficult to accept Ms. V.'s assertion that her ongoing search for suitable housing left insufficient time for regular visitation; while certainly the concern of this young mother, with a young child, regarding the locating of an appropriate apartment was understandably paramount, it is not credible that her activity in such regard would have been so time consuming as to preclude spending one hour a week with her sons at a relatively nearby foster home where she was always welcome. The result of the respondent's failure to visit with the two boys was apparent from Dr. Suarez's observations in CT Page 4372 November, 1991: the absence of any significant relationship or bonding between the mother and her young sons, an inability by the mother to interact at all with her children, and no observable "signs of affection" when mother and children were in one another's company.
As indicated, it is my view that the testimony of the foster mother and the social worker regarding the infrequency of respondent/mother's visitation during 1990/91 was [entirely] credible. Even weighing an interest of the foster mother, I am unable to conclude, from the totality and manner of her testimony, that she testified inaccurately or fallaciously regarding respondent's limited visitation (pre-filing). Respondent/mother emphasizes the fact that Julia V. did not produce records pertaining to visitation prior to September 1991;[62] however, Mrs. V. readily acknowledged that Elizabeth V. visited with some degree of frequency in the beginning stages of the placement, but then practically ceased visiting during the many months preceding the TPR's. Such was consistent with the findings of Dr. Suarez resulting from his observations made shortly after the TPR filings, and is reinforced by the credible testimony of the social worker that she repeatedly urged the mother to visit, as well as by the mother's recitation of the several reasons why she was not visiting.[63] At trial, for the first time, respondent/mother produced records purportedly showing numerous visitations in 1990/91. The court heard extensive testimony from Elizabeth V. and Angel O. regarding the manner in which those records were reconstructed; there were innumerable discrepancies regarding when the entries in the notebook were made, the source(s) of the information supporting the entries, when the notebook was purchased, the accuracy of a transcription by one unable to read or write, etc.[64] While the document was admitted into evidence as a purported record, its accuracy, reliability, and probative effect is minimal, considering the circumstances brought out regarding its preparation, and in view of what the court considers to be the entirely credible testimony of Julia V. and the social worker.
Certainly, the foster mother would know if Elizabeth V. visited regularly during 1990/91, or merely a total of four or five times during those years; I can find no basis on which to conclude that Julia V.'s testimony regarding the mother's infrequent visitation was untruthful.[65] Moreover, on the issue of the mother's interest, concern or responsibility CT Page 4373 prior to the filings, she never presented a viable plan for these children, while, at the same time, exhibiting virtually no cooperation with any reunification effort (flatly refused to enter a formal drug rehabilitation program, etc.). The credible evidence indicated that respondent missed most TP reviews, and furthermore, failed to keep the agency advised of changed residences, thereby running the risk of not receiving advance notification of the scheduled reviews. During the many months preceding the filing of the TPR's, respondent/mother never requested any overnight or weekend visitation. No letters or cards were forwarded to the children, and the credible evidence suggested that there was only one pre-filing birthday visit by the mother. And further, the credible evidence indicated that she expressed virtually no interest in the medical or educational needs of these two children; also, what few telephone calls were made to the foster parent(s) were not for the purpose of inquiring of the well-being of Anthony N. and Miguel R.
The court hereby concludes, applying a clear and convincing evidence standard of proof, that petitioner has established [statutory] abandonment as a ground for the termination of the parental rights of Elizabeth V. to her two sons, Anthony N. and Miguel R.; that is, that both Anthony N. and Miguel R. have been abandoned by Elizabeth V. in the sense that the said parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the said Anthony N. and Miguel R. The court further finds, by clear and convincing evidence, that said ground of [statutory] abandonment existed over an extended period of time which is not less than one year.
(3) [Respondent/Father: Miguel R., Sr.]
Miguel R., Sr., was incarcerated at the time of the birth of his son, Miguel R.; he has remained continuously incarcerated and, as stated, is serving a life sentence. The circumstance of incarceration, in and of itself, is not a legal basis for a finding of abandonment. [In Re JuvenileAppeal (No. 101555),] 187 Conn. 431, 443 (1982); [In Re MichaelM.,] 29 Conn. App. 112, 120 fn. 9 (1992); [In Re Juvenile Appeal(84-6),] 2 Conn. App. 705, 711 (1984); [In Re Adoption byL.A.S.,] 18 FLR 1532 (N.J.Sup.Ct., A.D., August 25, 1992). In the case of [In Re Juvenile Appeal (No. 101555),] it was stated: "The trial court was careful to indicate that . . . CT Page 4374 imprisonment alone does not constitute abandonment, and in this it was correct . . . neither the criminal act itself nor the imprisonment which followed [was] the foundation on which the court's decision to terminate rests." Id. at p. 443; [Seealso: In Re Juvenile Appeal (84-6),] 2 Conn. App. 704, 711
(1984). Nevertheless, as further observed by our Supreme Court, the restraints necessarily imposed by the circumstance of incarceration do not necessarily excuse the parent from making use of the limited resources available in the corrections facility to undertake to maintain contact with the distant child. 187 Conn. supra at p. 443.
Elizabeth V. was fifteen years, five months old at the birth of Miguel R.; the father, Miguel R., Sr. (d/o/b 9/6/56) had, as stated, provided the young mother with some assistance financially during the prenatal period. There is no credible evidence that following the child's birth, the father ever made any effort, while incarcerated continuously here [in thisjurisdiction,] to inquire of the child, communicate with the mother in regard to the child's welfare, or to have any contact whatsoever with Miguel R. At the 5/30/90 TP review, the father was provided with the worker's phone number and was told that he could request visitation through his counselor at the correctional institution. In my view, the credible evidence established that he never undertook to arrange visitation, that he never telephoned the social worker regarding the child or to make any inquiry regarding visitation, and that he never made any attempt to contact, or correspond with, the foster family regarding Miguel R. I do not accept as credible the assertion that he was unable, or did not have the means, to make written or telephone contact with the social worker concerning his son, or to request visitation; nor do I find any credible evidence that such contact or requests were ever attempted by Miguel R., Sr. during the pre-filing period. Regardless of any inability to place calls outside the prison, the father certainly was in a position to request that visitation be arranged through his counselor (familiar with the prison routine), as advised to do by the social worker, and consistent with the usual procedure whereby a visitation schedule at the institution is put in place. Miguel R., Sr. never so requested visitation and, as indicated by the credible evidence, his only pre-filing visit with his son was at the 6/10/91 review, which was arranged by the worker on her own, and not pursuant to any request by Miguel R., Sr. Thus, prior to the filing of the termination CT Page 4375 petition, the father had never requested visitation, and had seen his son on only one occasion.
Upon being informed that Miguel R. was in placement, the father [did] present a viable and perfectly reasonable plan (and he did request of the paternal aunt that she make inquiry regarding the child); however, prior to that time, as stated, it does not appear that he had any contact with mother and child. And while he offered the paternal aunt as a sensible and appropriate resource, he made no effort to personally inquire of, or to visit with, the child. Even though he was incarcerated, Miguel R., Sr. could well have arranged regularly scheduled visitation with his son, send gifts and cards, and made written and telephonic inquiries as to the child's well-being; in my view, there is no credible evidence that he did so. Clearly, neither a criminal act nor the resulting incarceration, viewed alone, would constitute statutory abandonment; however, on the totality of the credible evidence in this case, it is the court's assessment that Miguel R., Sr. did not, at all, make use of the limited resources at the correctional facility to maintain contact with Miguel R., and/or to develop and sustain any relationship with his son. As a consequence of such disinterest and inaction on the part of the father, Dr. Suarez found, as late as November 1992, no parental bonding with Miguel R., no signs of affection between father and son, and, at that point in time, Miguel R. did not recognize his father.[66]
Recognizing that the circumstance of incarceration, by itself, would not constitute statutory abandonment, the court, on the [totality] of the relevant factors, as established by the credible evidence, finds that petitioner has established, clearly and convincingly, the termination ground of [statutory] abandonment with respect to Miguel R., Sr.; that is, that Miguel R. has been abandoned by his father, Miguel R., Sr., in the sense that the said father has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child . . ." The court also finds, applying the same clear and convincing evidence standard of proof, that said ground has existed for a period of not less than one year preceding the adjudicatory date.
B. [Failure To Rehabilitate: Respondent/Mother.]
General Statutes Section 17a-112(b)(2) provides as CT Page 4376 follows: "The superior court upon hearing and notice may grant [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that with respect to a non-consenting parent, over an extended period of time, which . . . shall not be less than one year . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . . ."
The term "personal rehabilitation" refers to the restoration of a parent to his or her former constructive and useful role as a parent. [In Re Rayna M.,] 13 Conn. App. 23, 32
(1987); [In re Migdalia M.,] 6 Conn. App. 194, 203 (1986). Under the statute, the court must "analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, [determine] that such rehabilitation must be foreseeable `within a reasonable time.'" [In re Luis C.,] 210 Conn. 157, 167 (1989); [In reJoshua Z.,] 26 Conn. App. 58, 644 (1991). The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. [In re DevonM.,] 16 Conn. App. 693, 695-96 (1988). Under Section17a-112(b)(2), the court is to consider the age and needs of the child with respect to whether the parent could, within a reasonable time, assume a responsible position in the life of the child. cf. [In re Migdalia M.,] supra at p. 199. A "responsible position" in the life of the child is not necessarily equivalent to a full time caretaker; [In reMigdalia M.,] supra at p. 206; and, it is not statutorily required that the parent become capable of assuming full responsibility for the child without provision of available support programs. Id. at p. 203. Our Appellate Court has stated that a trial court must consider the several factors enumerated in Section 17a-112(d) in determining whether a parent has failed to rehabilitate. [In re Michael M.,] 29 Conn. App. 371,377 (1989); [In re Shavoughn K.,] 13 Conn. App. 91, 98
(1987).
At the time of the commitment (9/14/89), the court established reunification expectations which were reviewed with respondent/mother, and which were set forth on the CT Page 4377 written CIP expectation form signed by the mother and her attorney. Elizabeth V. did not comply with the expectations between the date of placement and the adjudicatory date (6/20/91). As set forth previously, evidence viewed as credible established, clearly and convincingly, that respondent/mother did [not] visit regularly and frequently with her sons, notwithstanding their continued placement together in one foster home located in the same city where the mother lived, and, notwithstanding DCF's (and the foster mother's) willingness to facilitate visitation. Additionally, the mother did not procure suitable and stable housing, did not cooperate with DCYS and fully keep the agency apprised of her whereabouts, and did not avail herself of the drug treatment and parenting skills referrals made by the Department. In the court's view, the credible evidence would support, substantially, a failure to rehabilitate finding predicated upon non-compliance with court established expectations.
Nevertheless, while the fulfilling of the expectations is important, and is to be accorded considerable weight, a failure to comply is not, of itself, the dispositive consideration. cf. [In re Luis C.,] supra at p. 167-68. As stated in [In re Michael M.,] supra, the "ultimate question" is whether the parent [is] more able to resume the responsibilities of parenting at the time of the filing of the termination petition[s] than she was at the time of commitment." 29 Conn. App. at p. 126. Any resolution of that issue in petitioner's favor must, of course, be supported by [clear and convincing] evidence. As indicated, the degree of personal rehabilitation must be such as would encourage the belief that within a [reasonable time,] considering the [age andneeds] of the child, the mother could assume a [responsibleposition] in the child's life; and, as previously stated, the issue of what is [reasonable] requires a factual determination, grounded on the credible evidence, regarding the circumstances of each particular case.
On the evidence, the court cannot conclude that respondent/mother has achieved a status where she is "more able" to parent these two boys than she was at the time of commitment. She never addressed, through appropriate, professional treatment, her drug and psychological problems. Dr. Suarez observed that those difficulties, as well as many other problems, prevented Elizabeth V. from parenting her sons properly and effectively. In the court's view, CT Page 4378 respondent/mother had ample opportunity to visit and to establish a meaningful relationship with Anthony N. and Miguel R.; both the Department and the foster parents were prepared to facilitate regular contact with the children, and the mother was not prevented through the unreasonable conduct of any person (or any agency) from taking steps to develop and maintain a relationship with her sons. Not having done so, and not having cooperated with DCF in the overall reunification effort, parental bonding developed with the foster parents. Additionally, the mother's housing remained unstable, parenting skills were not addressed through professional counseling, and there have existed clear indications of domestic violence in the mother's home; with reference to parental fitness, the mother's cohabitor of several years reported to DCYS, on more than one occasion, that the mother used drugs and did not properly attend to the care of her children. The evidence presented fairly disclosed that respondent/mother's current home is [barely] adequate for the proper care of her two younger children and, going back to the adjudicatory date, the mother did not maintain [any] stable home. Thus, there exists no basis, weighing the credible evidence, on which to conclude that Elizabeth V. is capable of responsibly parenting these two children, with whom she has not cultivated any bond, and by whom, she is not looked upon as a parent. Moreover, there is little, if any, basis on which to find that respondent/mother could responsibly parent these two children with the provision of professional support; she has never accepted referrals made by the Department, has been generally uncooperative with the agency, and remained consistently hostile to intervention.
Anthony N. was four and one-half years old at the time of filing, and is now seven; Miguel R. was three years old at filing and now is five and one-half. Both children have done exceedingly well in foster placement and, as Dr. Suarez made quite clear, both need permanency, certainty, and stability with respect to their home situation. On the credible evidence, respondent/mother has never been a reliable resource for these children. The credible evidence demonstrated an unstable home situation at the time of filing and, even to time of trial, an inability to provide a suitable, nurturing home for the two boys. Dr. Suarez testified that if the age and needs of these two older children are to be afforded material consideration, the youngsters should not have to wait any longer. Considering respondent/mother's unfortunate CT Page 4379 limitations, she has, to her credit, done reasonably well with her two younger children (at least, to the extent disclosed by the evidence); however, on the credible evidence as to what occurred prior to the adjudication date (and thereafter), I am, regrettably, unable to conclude that Elizabeth V. could, within a reasonable time, adequately and properly parent these children in a manner consistent with their needs, even with provision by the agency of professional support services.
It is hereby found that petition has established, by clear and convincing evidence, that respondent/mother is a parent of children who have been found by the Superior Court to have been uncared for/homeless in a prior proceeding, and further, that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in the lives of Anthony N. and Miguel R. Additionally, the court hereby finds, on clear and convincing evidence, that the said failure to rehabilitate ground has existed for a period of not less than one year preceding the adjudicatory date.[67]
C. [No Ongoing Parent-Child Relationship]
General Statutes Section 17a-112(b)(4) provides, as follows: "The superior court upon hearing and notice . . . may grant . . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to a non-consenting parent, over an extended period of time, which . . . shall not be less than one year . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The absence of a parent-child relationship involves a situation where the child has never known his parent so that no relationship ever developed between them, or where the child has clearly lost that relationship so that despite its former existence, it now has been completely displaced; our courts have stated: "`[i]n either case the ultimate question CT Page 4380 is whether the child has no present memories or feelings for the natural parent.'" [In Re Juvenile Appeal (Anonymous),]181 Conn. 638, 645-646 (1980); [In Re Juvenile Appeal (94-3),]1 Conn. App. 463, 479 (1984); [In Re Shannon S.,] 41 Conn. Sup. 145,158 (1989). Our Supreme Court has held that the statutory definition of no ongoing parent-child relationship is inherently ambiguous when applied to noncustodial parents who must maintain their relationship with their children through visitation. [In Re Valerie D.,] supra at p. 531; [In ReJessica M.,] 217 Conn. 459, 457-68 (1991). And, while normally the issue centers on positive feelings or memories of the child toward the parent, when dealing with an infant or child of a very tender age, the inquiry necessarily focuses on the positive feelings of the natural parent. [In re Valerie D.,] supra.
(1) [Respondent/Father: Jose N.]
Anthony N. has been in placement, continuously, since April 12, 1989; when placed, the child was two years, three months of age. Jose N.'s whereabouts have remained unknown, and he has had absolutely no contact with his son since the date of placement. There is no basis on which to conclude that Anthony N. has any memories of his father, Jose N. And, with respect to a child of very tender years, the inquiry generally focuses not on the feelings of the very young child, but on the positive feelings of the natural parent;" [In reValerie D.,] supra at p. 532; since Jose N. maintained no contact with his young son, there is no basis on which to conclude that the father harbored feelings of affection or concern for Anthony N. The court hereby finds that petitioner has established, by clear and convincing evidence, that there exists no ongoing parent-child relationship between respondent/father, Jose N. and the child Anthony N.
A permanent, loving, nurturing home is consistent with the best interests of Anthony N. In view of the father's lack of contact with, and an absence of concern for, this child, to allow further time for the establishment (or re-establishment) of a parent-child relationship would be detrimental to the best interests of Anthony N.
The court hereby finds that petitioner has proved, by clear and convincing evidence, the statutory ground of no ongoing parent-child relationship with respect to the CT Page 4381 respondent, Jose N., and, that said ground has existed for a period of not less than one year preceding the adjudicatory date.
(2) [Respondent/Mother: Elizabeth V.]
Anthony N. was two years, four months of age when placed; Miguel R. was nine months old when placed; prior to placement, both children had been primarily cared for by their natural mother. Accordingly, it is evident that an ongoing parent-child relationship, as defined by the statute, [did] exist at, and before, the time the children went into foster care. The evidence, in my view, [did not] disclose, clearly and convincingly, that the children do not know their natural mother, are devoid of any memories of her, or harbor any negative memories or feelings with regard to Elizabeth V. Concerning Miguel R., who was very young when placed outside of respondent/mother's home, the inquiry appropriately centers on the existence of positive feelings of affection on the part of the parent; [In re Valerie D.,] supra at p. 532; in such regard, Elizabeth V. has expressed love for both sons and her wish to serve as their caretaker.
It is the court's position, based on the evidence found to be credible, that respondent/mother has failed to maintain a reasonable degree of interest, concern, or responsibility with regard to her two sons; however, that circumstance does not necessarily equate with, or result in, the absence of an ongoing parent-child relationship. In this case, the evidence clearly showed an exceedingly troubled and confused relationship between the mother and her sons and, at best, a very weak parental bond or relationship with the subject children; however, again, such is not the equivalent of [no] ongoing parent-child relationship, as the statutory definition has been interpreted by our courts. Certain evidence presented concerned the very strong bond the children, quite understandably, have developed with the foster parents, and the psychologist's conclusion that, clearly, Mr. and Mrs. V. are the psychological parents of Anthony N. and Miguel R. While the court accepts the sound analysis of Dr. Suarez, proof the existence of a loving relationship, or a strong bond, or a "psychological parent" relationship with one other than the natural parent does not, of itself, establish the no ongoing parent-child relationship ground for termination of a biological parent's rights. [In re Jessica M.,] supra at 473-75. CT Page 4382
In the instant case, the mother, prior to the TPR filing, had extremely limited contact with these two children. However, early on, the foster mother informed them that they had a "real mommy"; on the few occasions when respondent/mother did visit, the visitation was appropriate and there were some expressions of affection. The boys knew their mother and, while the parental bonding became very strong with the foster parents, there was no evidence of hostile feelings or memories on the part of the children toward their biological mother. That Anthony N. and Miguel R. are "confused" regarding the role or place of their natural mother in their lives does not establish this ground; as stated, a [troubled] or [confused] relationship does not constitute an absence of any ongoing parent-child relationship. [In re Juvenile Appeal (Anonymous),] 177 Conn. 648,670-71 (1979). And, as stated, the fact that the parent-child relationship may not be a "meaningful" one, is not a sufficient evidentiary basis on which to predicate this alleged termination ground. [In re Jessica M.,] supra at p. 471. In my view, the relevant evidence demonstrated a [veryconfused] relationship between Elizabeth V. and her two sons, as well as the [strong] bond which had developed with the foster parents, who parented these children [continuously] during their years of placement. While the issue is indeed a close one, I do not feel that the evidence establishes, [clearly andconvincingly,] the absence of [any] parent-child relationship between mother and children.
Even if the court could find, by clear and convincing evidence, the absence of an ongoing parent-child relationship (as that statutory language has been interpreted), it would still be necessary to consider the extent to which the placement of these children (particularly Miguel R., age nine months when placed) contributed to such absent relationship under the rationale of [Valerie D.,] and other decisions handed down [after] the filing of these petitions. In [Valerie D,] dealing with a newborn, the court stated:
 ". . . once the child had been placed in foster care . . . a finding of no ongoing parent-child relationship three and one-half months later [was inevitable] . . . [because absent extraordinary and heroic efforts by the respondent,] the petitioner was destined to have established the absence of a CT Page 4383 relationship." (Emphasis added).
Respondent/mother did [not] visit the children with regularity and did not cooperate with DCYS in working towards reunification; thus, petitioner contends that a loss or displacement of the parent-child relationship(s) by the date of filing was caused by the mother's own voluntary inaction with regard to maintaining continuing contact with Anthony N. and Miguel R. However, even if the mother had adhered to a visitation schedule of a few hours per week, it seems unlikely that such visitation would constitute the "extraordinary and heroic efforts" necessary to establish, or to maintain, an ongoing parent-child relationship (as statutorily defined), particularly in the circumstances of this case where the children were quite young when placed and the foster parents continuously provided for their day-to-day care, needs, and nurturing. Therefore, if there existed an absence of any ongoing parent-child relationship(s) on June 20, 1991, such circumstance would have been substantially, and perhaps inevitably, the result of the continuous placement of these children, first under the authority of the VP, and thereafter pursuant to the commitment(s).
The court finds that petitioner has not established, by clear and convincing evidence, the alleged statutory ground of no ongoing parent-child relationship with respect to respondent/mother; accordingly, said ground may be, and hereby is, dismissed as to Elizabeth V.
(3) [Respondent/Father: Miguel R., Sr.]
With regard to the ambiguity in the statutory language (Section 17a-112(b)(4)), our Supreme Court has stated that "[i]t is reasonable to read the language of `no ongoing parent relationship' to contemplate a situation in which, [regardlessof fault,] a child . . has never known his . . parents, so that no relationship has ever developed between them . . ." (Emphasis added). [In re Jessica M.,] supra at p. 468.
At the time of Miguel R.'s birth, and continuously thereafter, respondent/father, Miguel R., Sr. was incarcerated. While incarceration alone does not constitute "cause for termination of parental rights," Miguel R., Sr., as stated, made no effort to make use of the limited resources at the correctional facility to have, or maintain, contact with CT Page 4384 his son. He saw his son, for [the first time,] on the social worker's own initiative and not pursuant to any request of his own, on June 10, 1991, just a few days before the filing of the TPR. Having had no contact with the child at all until just prior to the adjudicatory date, it is quite apparent that no ongoing parent-child relationship ever developed between Miguel R., Sr. and his son; the child could not have had memories and/or feelings for his father, positive or otherwise, since there had been virtually no father/son contact whatsoever prior to the filing.
In view of Miguel R. Sr.'s situation, it is neither likely nor foreseeable that an ongoing parent-child relationship (as statutorily defined) would be established. To allow further time for the unlikely establishment of an ongoing parent-child relationship would [not] be consistent with the best interests of Miguel R., which interests are permanency, certainty, and a stable, nurturing home environment. In my view, the testimony of the evaluator was clear, firm, and analytically sound that each of these boys should not have to continue to wait, and that to require either boy to do so would be to the child's psychological detriment.
The court finds that with respect to respondent/father, Miguel R., Sr., petitioner has proved, by clear and convincing evidence, the alleged statutory ground of no ongoing parent-child relationship, and that to allow further time for the establishment of such a relationship would be detrimental to the best interests of the child, Miguel R. Additionally, applying the mandated standard of proof, the court also finds that said termination ground existed for a period of not less than one year preceding the adjudicatory date.
[DISPOSITION]
General Statutes Section 17a-112(b) permits the court to grant a petition to terminate parental rights only upon a determination, based on clear and convincing proof, that to terminate would be in the best interests of the child. The best interest or dispositional decision is to be made upon the totality of the evidence (i.e., to last day of trial). [See:In re Michael M.,] 29 Conn. App. 112, 126 fn. 11 (1992). Additionally, the court is required to consider the statutory factors enumerated in Section 17a-112(d). CT Page 4385
Respondent/mother is now twenty-one years of age. She testified forthrightfully in court; her present, expressed feelings of affection for her two oldest children, and her stated desire to raise these boys, are, in the court's view, entirely sincere. The extremely difficult circumstances of Elizabeth V.'s past life are heartbreaking and unfortunate; this mother's circumstances currently, and going back through her early teenage years, evoke the sympathy of all involved with this case. As Dr. Suarez observed, the monumental responsibilities and commitments of motherhood were thrust upon her at age thirteen, when she was neither prepared, nor could be expected to have been prepared, to appropriately fulfill the demanding maternal role, especially without sufficient (if any) family support; indeed, to her credit, she recognized such inadequacies and voluntarily placed her two sons. Considering this young woman's lack of support from within her own family, and her social, emotional, psychological, intellectual, and educational limitations, she has achieved a noticeable and commendable degree of progress in the stabilization of her own life and in the provision of care for her two younger children. Notwithstanding the aforesaid, however, the court weighing (under the required standard of proof) the credible evidence in its totality, is unable to conclude that Elizabeth V., even at the current time, could parent Anthony N. and Miguel R. in a manner consistent with their best interests, or, that she could provide the permanency and domestic stability which these two young boys very much need, and [certainly deserve.]
As stated previously, there were indications that the mother's present home situation is barely adequate for the sufficient and appropriate care of the two youngest children and, additionally, there were disclosed (in the evidence) indicia reinforcing the evaluator's assessment of the mother's psychological, parenting, and substance abuse difficulties, which problems were never adequately addressed through professional therapy. In the court's view, the persuasive testimony of Dr. Suarez established, clearly and convincingly, that permanency, certainty, stability, and a nurturing home environment are entirely consistent with the best interest of these children. Based upon my consideration of the credible evidence, I are unable to conclude that Elizabeth V., even with professional support, could meet those best interest needs of Anthony N. and Miguel R. CT Page 4386
In his 1991 evaluation, Dr. Suarez found indications of "marked impairment of psychological functioning" on the part of respondent/mother, as well as "severe psychological problems," with an existing "acting out" potential. In 1991, communication between mother and sons was observed by the evaluator to be "extremely poor," with no noticeable signs of affection, and the boys appeared confused, distant, and distracted in Elizabeth V.'s presence. The evaluator found [no] parental bond existing between respondent/mother and the two children. With respect to the 1992 court ordered evaluation, respondent/mother did not show up, despite her more frequent visitation with the children during much of that calendar year. In 1993, the psychologist found that the situation involving the mother and her two oldest children had improved somewhat since 1991, resulting undoubtably, from the increased frequency of visitation; however, the degree of improvement was neither substantial nor particularly significant in the evaluator's opinion. A great deal of the mother's interaction with the boys was inappropriate, neither child responded as would be expected to the mother's signs of affection, and, according to the psychologist, no parental bond whatsoever was evident with one child, and merely a very weak bond existed with the other. Dr. Suarez testified that although the mother's behavior with the two boys in 1993 was "more effective" and "more positive" than in 1991, she still lacked knowledge about child rearing practice and appropriate age behavior in children, her capacity to parent was "quite questionable" and would "not be achievable within any reasonable time", and nothing which had occurred between the 1991 and 1993 evaluations would alter his conclusion that termination of parental rights would serve the best interests of Anthony N. and Miguel R. The essence of the psychologist's testimony was that domestic permanency, certainty, and stability are in the children's best interests, that such best interests objectives should not be delayed, and that to do so (or to separate these boys) would be to their psychological detriment. With regard to issues of parental bonding, as well as psychological consequences and interests, weight is necessarily and rightfully accorded, in a case such as this, to the testimony of a qualified professional psychologist. [See e.g., In re Juvenile Appeal,] 177 Conn. supra p. 667; [Inre Nicolina T.,] 9 Conn. App. supra at p. 605. The court is cognizant of, and has carefully weighed, the fundamental right of a parent to have custody of, and to raise, natural CT Page 4387 offspring, as well as the reciprocal right of a child to be brought up by a biological parent; nevertheless, on the totality of the credible evidence presented in this case, I do not feel that depriving Anthony N. and Miguel R. of a permanent, loving, nurturing adoptive home, provided by a family to which they have become strongly bonded, and returning them to the instability and uncertainty clearly incident to the mother's situation, would at all serve the best interests of these boys.
Miguel R., Sr. has shown a sincere interest in his son, Miguel R. In view of the father's confinement, he acknowledges an inability to personally provide parental care. Although expressing some ambivalence in his testimony regarding whether, in the first instance, the mother or the paternal aunt should be caretaker of his son, the father has consistently offered his sister, Ramona M., as an appropriate custodial resource. The court has carefully considered the evidence and can only conclude that Ramona M. is a fine, genuine person who loves, and is deeply concerned with, the well being of her nephew, Miguel R. Additionally, it is indisputable that the paternal aunt is an experienced and qualified foster parent, maintains a stable and wholesome home environment, and, as Dr. Suarez observed, is perfectly capable of adequately and effectively parenting (and raising) Miguel R. She has, admirably, offered to provide a home for both boys, and thereby avoid separating them. However, as indicated, there exists (on the perfectly credible evidence) no relationship or bond between Mrs. M and Anthony N. She has had extremely limited visitation and/or contact with Anthony N., and, in the court's view, it is both evident and understandable that her paramount affection and concern run primarily, if not entirely, to her nephew, Miguel R. Regardless, I cannot find that Ramona M. would be unable to provide an adequate home (but one lacking the permanency and certainty of an adoptive home) for both Anthony N. and Miguel R. As a foster placement for Anthony N., Ramona M. has both the credentials and the experience; however, the child now has the benefit of a fine and proven [foster] placement, in which he has strongly bonded. In my view, the child's needs exceed the uncertainty of foster care and demand a permanent, loving, nurturing home.
Ramona M. contacted the Department in 1990; from that time until late 1991, well after the filing of the petitions, CT Page 4388 the paternal aunt's visitation with Miguel R. was extremely limited. The DCYS worker encouraged visitation in order that Ramona M. could develop a relationship with her nephew. Since the aunt's visitation was very sporadic during 1990/91, Dr. Suarez, in his November 25, 1991 evaluation, found the relationship between aunt and nephew to be cordial and affectionate, but with "no bond established between Miguel and his aunt at present." The evaluator concluded, however, that there was the potential for bonding, given enough time. Nevertheless, in late 1992, following several months of frequent visitation by the paternal aunt, the evaluator, observing that Ramona M. and Miguel R. interacted "happily" and "appropriately," still found no evidence of a parental bond established between the child and his aunt.
The court accepts Dr. Suarez's continuing assessment that an exceedingly strong emotional bond exists between the brothers, that they should [not] be separated, and that to do so would be psychologically harmful to both and clearly inconsistent with their best interests. The two boys have been together in the same household virtually their entire lives; they are strongly emotionally attached, have relied upon one another for support, and derive emotional strength by virtue of being together in the same family unit. The psychologist testified, credibly and persuasively, that the psychologically detrimental effects of separating these children, and/or removing them from the devoted foster parents, with whom they have so strongly bonded, could be manifested through conduct involving severe depression, extreme acting out by the boys, and withdrawal. Given the totality of the circumstances in this case, I do not feel that these two brothers should be, or [deserve] to be, separated and subjected to such risks or psychologically devastating consequences.
Normally, the court would consider a placement with a blood relative as preferable. And, as stated, the court views Ramona M. as a highly qualified parent. However, in conjunction with the sound assessment of Dr. Suarez, the specific ramifications with respect to [each] child must be weighed in terms of one or both being placed in her continuing care. If just Miguel R. was placed with his aunt, the effect of being separated from his brother, and the foster family, considering the strong emotional bonds that exist, would be, as Dr. Suarez indicated, psychologically harmful to Miguel; CT Page 4389 and, the likely effect of such a separation would also involve, as the psychologist testified, psychological harm to Anthony N., who has lived almost continuously in the same home with his younger brother. On the other hand, if Anthony N. accompanied his brother to the home of Ramona M., he would be subjected to the emotional trauma of severing the strong parental bond with the foster parents, his day-to-day caretakers of many years, and would be placed in the custody of someone with whom he has no direct blood kinship, has had little contact, with whom there has been no significant bonding, and whose concern for Anthony N. appears secondary to, and primarily motivated by, her love and understandable wish to obtain custody of her own nephew. The court agrees with the assessment of the psychologist, and the position of counsel for the children, that under either scenario the result would be extremely traumatic, and [not] in the best interests of the two brothers.
With regard to Angel and Julia V., the evidence establishes that they have performed very well their responsibilities as foster parents. They love Anthony N. and Miguel R. and are desirous of adopting the two boys; the strong bonds that exist have been clearly established and documented in the evidence. The maternal care, guidance, and nurturing has been outstanding and both children have thrived in the placement; Mrs. V. has faithfully attended to the emotional, medical, and educational needs of these boys. Furthermore, as the attorney for the children states, in the person of Mr. V., both boys have a positive, attentive father figure and role model within the context of their own cultural heritage. At this point, [permanency] and [certainty] in this family structure are in the best interests of these children.
The court has carefully considered the statutory factors delineated in Section 17a-112(d), and has undertaken, applying the required standard of proof, to incorporate such considerations in the preceding analysis. By clear and convincing evidence, the court concludes:
(1) Services could not be put in place for Jose N. as his whereabouts were, and have remained, unknown. The court expectations were made known to Elizabeth V. at the time of commitment, and thereafter. She was kept advised of the location of the placement(s) and told of the necessity to visit regularly and maintain a relationship with her two sons. CT Page 4390 Telephone numbers and assistance with transportation were provided; although respondent initially visited with some regularity, her visitation was extremely sporadic in 1990/91, preceding the TPR filings. Timely referrals were made with respect to substance abuse and parenting skills counseling; the mother neither cooperated nor followed through. The agency's goal was reunification with the mother; while I feel DCYS might have been more insistent with, and directly attentive to, respondent/mother, considering her age, limitations, and unfortunate circumstances, the evidence did indicate that timely referrals and assistance were provided, that the mother could not be readily located for certain periods of time, that she was hostile to agency intervention, and that she did not cooperate in the reunification effort.
Miguel R., Sr. had no contact with his son during initial years of the child's life and, at the time of commitment, his whereabouts were not known to the Department. The court cannot conclude that simply because Mr. R. had been incarcerated from the birth of Miguel R., DCF was patently remiss in not ascertaining his whereabouts. When the father and the paternal aunt did inquire of DCF, the agency made timely visitation arrangements for Ramona M. and encouraged her to visit her nephew regularly; the aunt's visitation was sporadic during the period preceding the filing of these petitions. As stated heretofore, the social worker was in contact with Miguel R., Sr. at the correctional facility, advised him on how to arrange periodic visitation through the institution, provided telephone numbers, and the father was generally informed of the importance of maintaining continuing contact with his son.
(2) Neither the evidence nor a review of the court file discloses violations of court orders, other than respondent/mother's failure to be present for the 1992 psychological evaluation, and non-compliance with court established expectations.
(3) No evidence was presented indicating any feelings or emotional ties on the part of Anthony N. toward his father, Jose N. The credible evidence established: (a) both children have [very strong] feelings towards, and emotional ties with, their long-standing foster parents, Angel and Julia V.; (b) a similarly strong bond and emotional tie exists between the two brothers themselves, who have resided together, continuously, CT Page 4391 in the same household for a duration of years; (c) while respondent/mother's interaction with her two sons has improved, and has become more positive, no parental bond exists with one child, and only a very weak bond with the other; (d) in view of the limited contact, there exist no parental bond between Miguel and his father, Miguel R., Sr., and, there is no indication of significant feelings or emotional ties on the part of the child towards his natural father; (e) although there has been frequent visitation by Ramona M. with her nephew (beginning in late 1991), the relationship with Miguel R., while cordial and affectionate, does not reflect the establishment of any parental bond; and, (f) there exists no indication of any significant feelings or emotional ties on the part of Anthony N. toward Ramona M. To separate the two boys from one another, or from their current (and long-standing) caretakers, would be, in view of existing feelings, emotional ties, and psychological bonding, to the psychological detriment of both Anthony N. and Miguel R., and inconsistent with their best interests.
(4) Anthony N. is seven years old; Miguel R. is five and one-half years of age. They have resided together, continuously, in the V. foster home since mid-December, 1989. [Permanency] and [certainty,] particularly in view of their ages, are in the best interest of these two children.
(5) While the court feels that respondent/mother's efforts towards reunification with these two boys were quite minimal, her age, circumstances, limitations, and what appears as a complete lack of support from within her own family, cannot be overlooked or minimized; notwithstanding those considerations, it is the court's view that Elizabeth V. could have visited her sons regularly (particularly when the importance of frequent visitation with such young children had been impressed upon her), could have made a much greater effort to cooperate with the agency towards reunification, and should have followed through on referrals made to address substance abuse and parenting problems. To the mother's credit, she did undertake, with limited success, to find and maintain housing, and she did visit with a greater degree of frequency following the filing of the termination petitions.
As previously stated, Miguel R., Sr. did not, in the court's view, utilize the limited resources available in the correctional institution to develop a relationship with his CT Page 4392 son. With regard to Jose N., there was presented no evidence of any effort on his part towards effectuating a reunification with his son, Anthony N.
(6) I am unable to conclude that these parents were prevented from developing and/or maintaining a meaningful relationship with their children by the unreasonable act or conduct of any person, agency, or by economic circumstance. With respect to the father Jose N., his whereabouts remained unknown; no evidence was presented which would support a conclusion that he was unreasonably prevented from developing and fostering a parental relationship by any person or circumstance. As to respondent/mother, the credible evidence indicated that DCF obtained a local foster placement with both children in one home, put visitation arrangements in place, urged the mother to visit frequently, and was prepared to and offered to facilitate regular visitation (financially and otherwise). Concerning the father, Miguel R., Sr., the agency representative advised him of procedures for arranging visitation in the correctional facility and furnished telephone numbers; as stated, Mr. R. did not make use of the institution's procedures for periodic inmate/child visitation. The reliable evidence reasonably disclosed, in the court's view, that DCF was willing and prepared to facilitate visitation at the correctional facility.[68]
[CONCLUSION]
Petitioner has met its burden of proof by clear and convincing evidence; the best interests of Anthony N. and Miguel R. will be served by freeing each child for adoption, and by the provision of a [permanent,] certain, loving, and stable home through the adoptive process. Accordingly, the petitions to terminate the parental rights of Jose N., Elizabeth V., and Miguel R., Sr. are hereby [Granted]; and, the Department of Children and Families is appointed Statutory Parent for each of the said children, Anthony N. and Miguel R. Pursuant to General Statutes Section 17a-112(i), a case plan report shall be submitted to this court by the Commissioner within ninety (90) days, and thereafter as the court may require, but no less often than annually.[69]
Mulcahy, J. CT Page 4393